UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL RAY MITCHELL,<br><br>Defendant. | 4:21-CR-40008-KES<br><br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Michael Ray Mitchell is before the court on an indictment charging him with possession of a firearm by a prohibited person. See Docket No. 1. Mr. Mitchell has filed a motion to suppress certain evidence. See Docket No. 25. The United States ("government") resists the motion. See Docket No. 26. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

## FACTS

An evidentiary hearing was held on July 1, 2021. Mr. Mitchell was there in person along with his lawyer, Assistant Federal Public Defender Amanda Kippley. The government was represented by its Assistant United States

Attorney, Jeffrey Clapper, and law student Benjamin Schroeder.  Five witnesses testified and five exhibits were received into evidence.[1]  From this testimony and these exhibits, the court makes the following findings of fact.

On the morning of December 18, 2020, law enforcement officers belonging to the inter-agency Fugitive Task Force were trying to serve an arrest warrant on Anthony Richards.  Mr. Richards is a registered sex offender who had registered that he was living at 2101 E. 30th Street North in Sioux Falls, South Dakota. In addition, a law enforcement database listed the address as belonging to Mr. Richards.

Minnehaha County Deputy Sheriff Cody Lowe was the lead officer on executing this warrant.  With him were Sergeant Craig Butler, Sergeant Kiel Ricci,[2] and Deputy Link Mitchell, all also of the Minnehaha County Sheriff's Office; and Deputy Jack Valentine of the United States Marshals Service.

All officers drove to the address on East 30th Street North, arriving about 9:45 a.m., and positioned themselves around the dwelling so that all avenues of escape could be seen.  The officers from the Minnehaha County Sheriff's

---

[1] The five witnesses were:  Cory Lowe, Kiel Ricci, Craig Butler, Christina Tillman and Cameron Tillman.  The five exhibits introduced into evidence were all photographs or drawings of the Tillman home.  See Docket No. 30.

[2] On December 18, 2020, Kiel Ricci was a deputy sheriff, but by the time the evidentiary hearing in this matter was held, he had been promoted to Sergeant. The court refers to him by his present rank rather than his former rank.

2

Office who testified stated they were familiar with the house and its residents as they had been called to the house several times before.

Deputy Lowe and Sgt. Ricci went to the north side of the house facing East 30th Street North as depicted in Exhibit 5. There is a door approximately 2½ to 3 feet off the ground in the middle of the side of the house. No steps lead up to the door and there is no sidewalk leading to the door, just grass. Deputy Lowe testified they knocked at the north-facing door, but no one answered.

Deputy Lowe and Sgt. Ricci then walked around to the west side of the house facing St. Paul Avenue. On the west side of the house, depicted in Exhibit 1, there is a cement driveway, a garage door for a double-wide garage, and a "man" door to the left (north) of the garage door. As Deputy Lowe and Sgt. Ricci approached this door to knock, Sgt. Butler drew near on the southwest corner of the garage. Deputy Lowe knocked on the man door and Cameron Tillman came to the door to answer it. Officers knew from past contact that Cameron Tillman lived in the garage of the house and had been doing so for at least a couple of years.

Cameron was approximately 30 years old and on parole or probation for a drug offense on December 18, 2020. He had previously been convicted of several felonies. His mother, Christina, was the lessee on the lease for the house. Although Cameron's bed was in the garage, he testified he could freely enter the main house without having to ask his mom permission to do so. He frequently did enter the main house to use the kitchen and bathroom and to

take the dogs out. On at least one prior occasion Cameron was in the main house when officers arrived on a report from Jessica, another resident of the house, that Cameron had assaulted her.

Deputy Lowe explained that they had an arrest warrant for Anthony Richards. Cameron responded that Mr. Richards was not in the home at that time. Deputy Lowe asked who was in the home. Cameron responded that his mother, Christina, and his mother's partner, Jessica, were in the house.[3] Deputy Lowe and Sgt. Butler testified that, at this point, Deputy Lowe asked Cameron for permission to enter the house to search. Both officers testified Cameron gave consent to search. Cameron testified the officers just came in without asking for permission.

Sgt. Ricci testified he was standing far enough behind the other officers that he did not hear their specific conversation with Cameron. However, he saw Cameron step back from the door to permit the officers entry and Sgt. Ricci assumed consent to search had been asked for and granted. The officers testified if Cameron had not given consent to enter the home, they would have left as they were aware they had no independent circumstances justifying a warrantless entry into the home.

---

[3] Cameron testified he told the officers his mother and Jessica were in the house. Deputy Lowe testified Cameron told him his mother and his sister were in the house. This discrepancy is not material to the issues raised by Mr. Mitchell's suppression motion.

The garage was filled with miscellaneous articles and clutter, but no vehicles. The dimensions of the garage were wide enough for two cars, with an extra approximately twenty feet in length added onto the back end of the garage. A tarp or blanket was hung from the ceiling to separate Cameron's living quarters at the rear of the garage from the rest of the garage. Cameron's living quarters consisted of a bed, a table, a television, and more clutter. There was no bathroom or any plumbing in the garage, nor was there a separate kitchen in the garage.

After stepping inside the garage, Deputy Lowe called for reinforcements using his body mic. Deputy Mitchell and Deputy Valentine joined the other officers. Deputy Lowe stayed with Cameron just off to the side of the man door into the garage while other officers checked the garage for other occupants. After the garage was cleared, the other officers entered the house from a door inside the garage that led into the kitchen. See door B on Exhibit 4. Deputy Lowe remained with Cameron Tillman in the garage at all times near what is marked as door A on Exhibit 4.

The layout of the home consisted of a kitchen, two bedrooms and one bathroom on the main floor and an unfinished basement with no rooms or plumbing of any kind. Officers checked the kitchen and then the two bedrooms. Christina, Cameron's mother, was asleep in the bedroom in the northeast corner of the main level of the house. She awoke when the officers entered her room, opened her eyes, and rolled over and went back to sleep.

Officers found Jessica asleep in the other bedroom in the southeast corner of the main floor.

No conversation took place between any of the officers and either of the two women. Christina did not question why officers were in her house nor did she order them to leave. After they left, she did not file any type of complaint with law enforcement regarding the entry into her home. Christina was the named lessee on the rental agreement for the house, though the officers testified they did not know if the house was owned or rented and who was the owner or lessee on the lease. Christina testified that Anthony Richards as well as other registered sex offenders used her address as their official registration address.

After securing the main floor of the house, officers next went down the stairs leading from the kitchen to the basement. They saw a couch from the backside with two feet protruding off the end of the couch. Officers told the person on the couch (Mr. Mitchell) to show both his hands. At first, he showed only one hand. When officers repeated their command to show both hands, Mr. Mitchell raised both hands. Officers then instructed him to stand up, which he did. Once Mr. Mitchell stood up, the officers could see an empty pistol holster strapped to his waist or leg.

The officers had Mr. Mitchell step away from the couch where he had been reclining. Plainly visible between two of the couch cushions was the slide and the sight to a pistol shoved down between the cushions. Officers retrieved

6

the pistol from between the couch cushions. An Altoids tin containing narcotics was also discovered on Mr. Mitchell's person or in the environs where he was sleeping. Mr. Mitchell was eventually indicted in this court for being a convicted felon in possession of a firearm and being an unlawful user of a controlled substance in possession of a firearm.

On the way out of the house with Mr. Mitchell in handcuffs, Sgt. Ricci said to Cameron, "I thought you said there was no one else in the house?" According to Sgt. Ricci, Cameron just dropped his head and refused to meet the officer's gaze.

Mr. Mitchell now moves to suppress the firearm, holster, the Altoids container and its contents and all other evidence seized from the Tillman residence pertaining to him. He argues that the arrest warrant for Anthony Richards did not give officers a legal right to enter the Tillman house absent exigent circumstances or consent, neither of which were present here. In addition, Mr. Mitchell argues that if Cameron Tillman did consent to the officers' entry, the officers' reliance on Cameron's apparent authority to give that consent was unreasonable. The government resists each of these arguments.

## DISCUSSION

**A.    Whether Mr. Mitchell Has Standing to Object**

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Maryland v. Buie, 494 U.S. 325, 331

(1990).  In determining the reasonableness of a search, courts are to balance "the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  Id.  A search of a home without a warrant supported by probable cause is usually unreasonable.  Id.  "[N]o zone of privacy is more clearly defined than a person's home: '[T]he Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.' " United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997) (quoting Payton v. New York, 445 U.S. 573, 590 (1980)).

There are, however, several exceptions to the warrant requirement "where the public interest is such that neither a warrant nor probable cause is required."  Buie, 494 U.S. at 331.  Because the court determines below that the arrest warrant for Anthony Richards did not permit the officers to enter the Tillman home, the entry was warrantless and the burden is on the government to establish that an exception to the warrant requirement applies.  Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005); United States v. Weston, 443 F.3d 661, 668 (8th Cir. 2006).

The government argues that Mr. Mitchell does not have standing to object to the search of the house because he was not the owner or lessee of the home.  The Eighth Circuit has stated the following about the subject of standing in the Fourth Amendment context:

> "[T]he person challenging the search has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept." Several factors have been identified as relevant to this showing: "whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place; whether the party took precautions to maintain the privacy; and whether the party had a key to the premises."

United States v. Mendoza, 281 F.3d 712, 715 (8th Cir. 2002) (quoting United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999)).

The Supreme Court has held that an overnight guest in a house had a legitimate expectation of privacy, but "one who is merely present with the consent of the householder may not." Minnesota v. Carter, 525 U.S. 83, 89-90 (1998) (citing Minnesota v. Olson, 495 U.S. 91, 98-99 (1990), and Rakas v. Illinois, 439 U.S. 128 (1978)). "[S]tatus as an overnight guest is alone enough to show that defendant had an expectation of privacy in the home that society is prepared to recognize as reasonable." United States v. Wiest, 596 F.3d 906, 909 (8th Cir. 2010) (quoting Olson, 495 U.S. at 96-97).

Testimony from Christina Tillman established that Mr. Mitchell was the father of another son of hers, Tavian, and that Mr. Mitchell frequently spent the night at her house with her permission. Furthermore, she testified Mr. Mitchell spent the night at her house with her permission on the night of December 17, 2020. Since Mr. Mitchell was a permitted overnight guest in the Tillman home, the court concludes he has standing to contest the search. Olson, 495 U.S. at 96-97.

9

### B. Whether Officers Had Consent to Enter

#### 1. Whether The Arrest Warrant Justified Officers' Entry

If officers possess a valid felony arrest warrant for a suspect, they may enter "a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980). In order to search the home of a third party to look for the subject of an arrest warrant, officers must have either exigent circumstances or consent. Steagald v. United States, 451 U.S. 204, 205-06 (1981). The question becomes, then, whether Anthony Richards lived at the Tillman home. If Mr. Richards lived at the home, and if officers had reason to believe he was inside the home at the time, the arrest warrant gave them the right to enter the home to arrest Mr. Richards. If Mr. Richards did not live at the home, the arrest warrant did not permit the officers to enter unless there were exigent circumstances or consent.

Deputy Lowe candidly admitted that without Cameron Tillman's consent, the officers were not in possession of facts which would justify their entry into the home otherwise. The government did not argue that any exception to the warrant requirement exists other than consent. Furthermore, although Mr. Richards had previously used the address of the home to register as a sex offender, the government did not introduce any evidence to show that officers had reason to believe Mr. Richards was in the home at the time. Therefore, the court concludes the arrest warrant for Anthony Richards did not itself justify the officers' entry into the home.

10

### 2. Whether Cameron Consented to Allow Officers to Enter and Search

Mr. Mitchell argues that Cameron did not give consent to enter the home. The government argues he did. A consent to search is valid if the "totality of the circumstances demonstrates that the consent was voluntary." United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990). The government must prove voluntariness by a preponderance of the evidence. Id. Consent is voluntary if it is the product the free and unconstrained choice of its maker, rather than duress or coercion. Id. The court considers the totality of circumstances in determining if consent was voluntary. Id. See also United States v. Lakoskey, 462 F.3d 965, 973 (8th Cir. 2006) (same).

Here, Mr. Mitchell does not argue that Cameron's consent was coerced. Rather, that he did not consent at all. The government argues that Cameron did give consent.

As discussed above, Cameron testified that the officers just kind of migrated into the garage after he answered their knock on the door. He stated they did not ask him for permission to search, but just went about conducting a search for Anthony Richards after asking Cameron who was in the house. Cameron did not testify that he protested the officers' entry in any way or tried to block their entry.

Deputy Lowe testified that he told Cameron the officers were at the house to arrest Anthony Richards. Cameron replied Mr. Richards was not in the

11

house.  Deputy Lowe testified he then asked Cameron for permission to search and Cameron said yes.

Sgt. Butler testified he could not remember the exact words that were exchanged between Deputy Lowe and Cameron, but that Deputy Lowe asked for permission to search and that Cameron assented to that search.  Both Deputy Lowe and Sgt. Butler candidly testified they would not have entered the house without Cameron's consent because they did not have any other justifiable reason to enter without a search warrant.

Sgt. Ricci testified he did not hear the conversation which occurred between Deputy Lowe and Cameron, but he assumed Cameron had given consent because Cameron stepped back from the door to allow the officers to enter.

The officers present at the scene did not create audio or video recordings of the encounter with Cameron or of their subsequent search of the house.  No testimony was elicited about whether the fugitive task force officers typically did or did not wear body cameras or audio recorders when they execute arrest warrants.

The court makes a specific credibility finding that the officers were testifying truthfully and that Cameron's testimony, to the extent it varied from the officers' description of events, was not credible.  There was no evidence introduced to suggest the officers lied on December 18, 2020, or at the evidentiary hearing held in this matter.  To the contrary, there *was* evidence

12

introduced that Cameron lied on December 18—he told the officers only two occupants were in the house, his mother and Jessica, thus omitting Mr. Mitchell's presence.  Moreover, there is some evidence that this was a lie and not an innocent omission—when the officer confronted Cameron after Mr. Mitchell had been discovered, Cameron dropped his head as if admitting the lie and not wanting to meet the officer's gaze because of the lie.

The court also takes note of the fact that Cameron was very experienced with the criminal justice system, thus making it more likely he knew he could deny the officers permission to enter the house if he wanted to.  Also, Cameron's testimony was *not* that he denied the officers consent to enter.  Rather, Cameron testified they just came in.  We know from Sgt. Ricci's testimony that—regardless of the exact conversation which occurred between the officers and Cameron--the officers came in when Cameron stepped aside from the doorway.

The Eighth Circuit has found similar conduct to constitute implied consent to enter a dwelling.  See United States v. Faler, 832 F.3d 849, 853 (8th Cir. 2016) (implying consent when apartment resident stepped aside from doorway allowing officers to enter the apartment); United States v. Smith, 973 F.2d 1374, 1376 (8th Cir. 1992) (implying consent when the defendant's wife stepped aside and motioned for officers to enter); United States v. Turbyfill, 525 F.2d 57, 59 (8th Cir. 1975) (implying consent when the defendant's wife opened the door and stepped back to let officers enter).  When considering implied

consent, the court is *not* to consider whether the person subjectively consented, but rather "whether his conduct would have caused a reasonable person to believe that he consented." Faler, 832 F.3d at 853 (quoting United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001)).  When Cameron stepped away from the doorway, the court finds he was impliedly consenting to the officers' entry to look for Anthony Richards.

Whether Cameron's consent was express or implied, the court concludes consent was given.  Furthermore, the court finds that consent to have been voluntary and intelligent.  Therefore, the officers' entry into the Tillman home was based upon Cameron's valid consent.

## C. Whether Officers' Reliance on Cameron's Consent Was Reasonable

Mr. Mitchell argues that Cameron Tillman was strictly a resident of the garage and, as such, had no authority to give consent to search the house, a fact Mr. Mitchell argues the officers should have known.  The government argues that it reasonably believed that Cameron had the authority to give consent to search the home.

The Supreme Court has held that when the government attempts to justify a warrantless search by asserting voluntary consent from a third party, the government must show that the third party had common authority over the premises or effects sought to be searched or a sufficient relationship to said premises or effects.  United States v. Matlock, 415 U.S. 164, 171 (1974).  In explanation, the Court stated that common authority over property rests not

14

with a legal interest in the property, but "rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched." Matlock, 415 U.S. at 171 n.7.

In deciding whether a third party had authority to give consent to search, the officer "must reasonably believe that, given the totality of the circumstances, the third party possesses authority to consent." Weston, 443 F.3d at 668 (citing Illinois v. Rodriguez, 497 U.S. 177, 186 (1990); United States v. Pennington, 287 F.3d 739, 746-747 (8th Cir. 2002) (stating that "[t]he critical facts . . . are not the actual relationship between the consenter and the owner, but how that relationship appears to the officer who asked for consent.")). This standard is an objective one: "would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" Rodriquez, 497 U.S. at 189 (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)).

In Frazier v. Cupp, 394 U.S. 731, 740 (1969), the Court found that the defendant's cousin had the authority to consent to a search of a duffle bag that both the defendant and the cousin shared and that the defendant had left at his cousin's house.

In the <u>Weston</u> case, the court held that the officers reasonably believed that Weston's ex-wife had authority to give consent to search Weston's house because the ex-wife and Weston had been married, they had a child together, the officer knew that the ex-wife and Weston had remained close despite their divorce, the officer had seen the ex-wife at Weston's home three times in four years, and at the time the officer sought consent, the ex-wife was inside Weston's home despite the fact that Weston was not home.  <u>Weston</u>, 443 F.3d at 668.

In <u>United States v. Baswell</u>, 792 F.2d 755, 759 (8th Cir. 1986), a caretaker of a vacation home had a key to the home and authority to enter the home for the limited purpose of making repairs and cleaning for compensation. The defendant Baswell, by contrast, had authority to stay in the house and use it fully and freely for his own benefit, a right of use not accorded to the caretaker.  <u>Id.</u>  However, the court approved the caretaker's authority to grant consent to search under the agency theory of "apparent authority," citing to the Supreme Court case of <u>Stoner v. California</u>, 376 U.S. 483, 488-489 (1964).  See <u>Baswell</u>, 792 F.2d at 759.

In the <u>Stoner</u> case, clues discovered after a robbery led the police to believe that one of the robbers was residing at the Mayfair Hotel.  <u>Stoner</u>, 376 at 484.  The officers went to the hotel and asked the night clerk whether Stoner was registered at the hotel.  <u>Id.</u> at 485.  The night clerk responded in the affirmative, but indicated that Stoner was not in his room at the moment.  <u>Id.</u> The police asked for permission to search Stoner's room, explaining that they

believed Stoner had been involved in a robbery and that the police were concerned that there might be a weapon in the room. Id. The night clerk gave the police permission to search Stoner's room and opened the door to Stoner's room with a hotel key. Id.

The Supreme Court held that the search was unreasonable under the Fourth Amendment because the night clerk did not have the authority to consent to a search of Stoner's room and the police did not reasonably believe that the clerk had such authority. Id. at 488-489. This was true even though it was implicit in Stoner's rental of the hotel room that he had given permission to persons such as maids and repairmen to enter his room in the performance of their duties. Id. at 489. Such permission did not constitute acquiescence in the night clerk's giving the police consent to search the entire room. Id.

In a passage that strongly calls into question the Baswell court's characterization of the Stoner decision, the Supreme Court stated that "the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority' " Id. at 488. The Court went on to state that:

> it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. . . . [W]e ought not to bow to them in the fair administration of the criminal law.

Stoner, 376 U.S. at 488 (quoting from Jones v. United States, 362 U.S. 257, 266-267 (1960)). That Fourth Amendment analysis does not

17

depend on common law property theories like apparent authority was made even more clear in the subsequent case of Matlock, in which the Court stated that, "[t]he authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rather rests on mutual use of the property by persons generally having joint access or control for most purposes." Matlock, 415 U.S. at 171 n.7 (citing Stoner, 376 U.S. 483).

Here, the evidence was that Cameron had a bed and possibly an entertainment center or television in the garage. However, he himself testified he could freely enter the main house whenever he wanted to without first having to ask permission. He entered the main house to use the bathroom, the kitchen, and to let the dogs out. His garage living quarters did not have a separate address, apartment number, or separate mailbox. The officers had previously encountered Cameron present in the main part of the house on at least one prior occasion. These facts more than adequately demonstrate that Cameron had mutual use of the property and joint access or control for most purposes. Id. Accordingly, the officers were justified in relying on Cameron's consent to enter the house. No violation of Mr. Mitchell's Fourth Amendment rights occurred.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends denying Mr. Mitchell's motion to suppress [Docket No. 25] in all respects.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED July 6, 2021.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge